IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

PHILLIP J. BARKER,                          )
                                            )
                 Plaintiff,                 )
                                            )
        v.                                  )        4:12-CV-29-APR
                                            )
CAROLYN W. COLVIN, Acting                   )
Commissioner of the Social Security         )
Administration[1],                          )
                                            )
                 Defendant.                 )


OPINION AND ORDER

        This matter is before the court on the petition for review of the decision of the

Commissioner of Social Security filed by the claimant, Phillip J. Barker, on April 27, 2012.  For

the following reasons, the decision of the Commissioner is **AFFIRMED.**


Background

        The plaintiff, Phillip Barker, filed an application for Disability Insurance Benefits on

June 20, 2008, alleging a disability onset date of May 6, 2007, due to arthritis, cerebrovascular

disease, depression, and anxiety.  (Tr. 26, 99, 106, 169-171) After his application initially was

denied and was denied again upon reconsideration, Barker requested a hearing.  A hearing was

held before Administrative Law Judge Lisa Chin.  (Tr. 44-98) Barker and vocational expert Lee

Knutson testified at the hearing.  (Tr. 44-98) On November 23, 2010, the ALJ issued her

_____

        [1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social
Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

decision denying benefits.  (Tr. 26-37) Barker requested a review of the ALJ's decision and submitted a memorandum and additional evidence in support.  (Tr. 21-22) On October 6, 2011, the Appeals Council denied review, making the ALJ's decision the Commissioner's final determination.  (Tr. 5-10, 21, 320-322, 690-888)

Barker was born in December 1963, making him less than 50 years old at the time the ALJ issued her decision.  (Tr. 169) He has a high school education and past relevant work as a pipe layer.  (Tr. 191, 194)

In January 2006, prior to the alleged onset date, Barker's knee x-rays revealed early osteoarthritic changes. (Tr. 325, 342)  Barker saw his treating physician, Joseph Kacmar, M.D., and reported generalized joint pain.  His knee pain started about seven months prior with bilateral knee pain that was worse with weight-bearing activities. He was prescribed Vicodin and instructed to reduce his activities if possible. (Tr. 332) Barker also received chiropractic treatment for spine and pelvic pain from July 2005 through February 2008. (Tr. 393-407, 464)

In October 2006, Barker lost his job and reported being unable to work due to joint pain. (Tr. 336) By November 2006, Barker told Dr. Kacmar he was having a lot of joint pain, was very depressed, tearful, and not sleeping.  Dr. Kacmar prescribed Effexor and Xanax. (Tr. 333) The Effexor prescription was discontinued in October 2007 due to a rash, and the Vicodin prescription was increased due to increased bilateral knee pain. (Tr. 335) On July 8, 2008, Barker's Vicodin again was refilled due to osteoarthritis, and Barker's Xanax prescription was refilled due to anxiety with chest pain. (Tr. 367)

On August 5, 2008, Barker was evaluated by Gary Durak, Ph.D. at the Commissioner's request. Dr. Durak noted that Barker's motor activity was slowed due to problems with his gait.

2

(Tr. 348) Dr. Durak diagnosed Barker with adjustment disorder with depressed mood and assigned a Global Assessment Functioning score of 60. (Tr. 350) On September 19, 2008, a non-examining state agency psychologist opined that Barker's affective disorder was not severe. (Tr. 352)

On October 8, 2008, Barker sought emergency treatment for acute onset dizziness with an inability to walk without falling to the left side. (Tr. 375-80, 476-506) An echocardiogram was normal, and a CT scan of the head showed a lesion in the cerebrellar hemisphere, possibly subacute or chronic. (Tr. 371, 373)

On October 22, 2008, Barker was examined by Teofilo Bautista, M.D. at the Commissioner's request. Barker reported that his joint pain started 15 years prior but that it worsened in the last 2 ½ years. He reported being able to walk 150 feet, sit for up to 20 minutes, stand for up to 20 minutes, and lift 10 pounds. (Tr. 386) Barker walked with a slight limp due to right knee pain, and mild right knee tenderness and pain were noted. Barker "[r]efused and [was] unable to do" range of motion of the back and heel and toe walking due to low back pain and left hip pain.  Mild pain and tenderness of the lumbosacral spinal areas was noted on examination. Upon examination, the right knee reflex was abnormal. Dr. Bautista diagnosed osteoarthritis of the right knee and arthralgia of the left knee. (Tr. 388) On December 2, 2008, non-examining state agency physician B. Whitley, M.D. concluded that Barker was capable of light exertional activity with occasional postural limitations and no balancing. However, he did not review any treating or examining source statement regarding Barker's physical limitations prior to rendering his opinion. (Tr. 412-19)

On February 2, 2009, Barker was examined by Ikechukwu Emereuwaonu, M.D. at the

Commissioner's request. Barker reported joint pain for the prior 15 years, which he attributed to his history of heavy labor. Barker reported difficulty doing household chores and difficulty working on his car due to pain. (Tr. 420) On examination, Barker had a limping and unsteady gait with severe difficulty walking on his toes and moderate difficulty with other walking and squatting tests. Dr. Emereuwaonu concluded that Barker "has musculoskeletal pain that affects functioning. Aggressive [medical] management may alleviate symptoms and thus improve functioning." (Tr. 423)

On April 21, 2009, Barker first received treatment with Spencer Markowitz, M.D. for pain management. Barker was noted to have difficulty with anxiety, for which he took Xanax. Upon examination, Dr. Markowitz noted crepitus of the knees, elbows, shoulders, hands, and wrists bilaterally, with tenderness in the knees and ankles, bilateral knee effusion, thickened synovium of the hands and wrists, and also elbow tenderness. Dr. Markowitz noted  that hypertension, joint pain at multiple sites, and major depression, single episode, were the working diagnoses. (Tr. 459-461)

On May 6, 2009, Dr. Markowitz noted that Barker completed the Pain Inventory sheet, but he circled 10/10 for all scales. This was discussed, and Barker explained that the pain was not the worst ever, but was unacceptable. Dr. Markowitz was concerned that the nonspecific liver function abnormalities were part of an underlying cause for Barker's joint pain. Barker reported his depression was better after being prescribed Cymbalta. (Tr. 438-440, 455) However, his musculoskeletal examination still was abnormal. (Tr. 456) On May 26, 2009, Barker's Cymbalta dose was increased. Barker reported feeling fatigue and having nausea and vomiting, which he associated with anxiety. Dr. Markowitz concluded that Barker demonstrated

diminished higher cognitive function as illustrated by his difficulty in responding to the Pain Inventory questionnaire. (Tr. 452) Barker continued receiving pain management from Dr. Markowitz, in addition to medical management for anxiety symptoms. (Tr. 445-450) On July 23, 2009, Dr. Markowitz referred Barker for evaluation with a rheumatologist due to his concern that Barker may have a collagen vascular disease, possibly involving his liver. (Tr. 569) On August 24, 2009, a lumbar spine CT examination demonstrated a disc bulge with bony spondylotic change resulting in mild stenosis at L4-5, and a disc protrusion at L5-S1. (Tr. 669)

On August 25, 2009, Dr. Markowitz provided a summary of Barker's diagnoses, which included essential hypertension (well controlled), joint pain at multiple sites (pending further evaluation), and depression with anxiety (improved with medication). He explained that Barker's overall condition was guarded, and although he was improving, he "still has considerable chronic back pain and is now having some radicular pains from his back into his right lower extremity", which was one of the issues pending further evaluation. (Tr. 568) A September 13, 2010 echocardiogram showed mild bilateral and left ventricular enlargement, and a Doppler study showed mild atherosclerosis of the bilateral leg arteries. (Tr. 672-673) Barker also had 50-69% stenosis of the left internal and 70% or greater stenosis of the bilateral external carotid arteries. (Tr. 674)

Barker also received physical therapy in October and November 2009 for intermittent right lower extremity pain. Barker was discharged from therapy and was awaiting insurance authorization for pain management. (Tr. 570, 585-610)

On November 10, 2009, Dr. Kevin Joyce completed a medical source statement and determined that Barker was limited to lifting less than 5 pounds frequently and less than 10

5

pounds occasionally, standing and walking a total of one hour, and sitting a total of 30 minutes

daily. Dr. Joyce cited Barker's low back pain with disc bulge and stenosis with knee

osteoarthritis in support. (Tr. 571-73) Dr. Joyce stated that he was a board certified

Rheumatologist. (Tr. 574)

On December 2, 2009, Barker was evaluated by S. Dasari, M.D. for pain management.

Dr. Dasari noted an August 2009 CT scan indicating a herniated disc at L4-5. Barker reported

back pain radiating into his right leg, in addition to pain in all his major joints. (Tr. 611) Dr.

Dasari diagnosed Barker with right lumbar radicular pain and a herniated disc at L4-5. (Tr. 612)

An epidural steroid injection at L4 and L5 was provided, and Barker reported 90-95% relief of

pain. (Tr. 623-25) Lidoderm patches were prescribed for pain. (Tr. 626) On March 24, 2010, Dr.

Dasari noted that Barker could not undergo an MRI, but he was provided with Synvisc injections

for knee pain. (Tr. 631) Fluid was aspirated from the knees on April 1, 2010, and additional

injections were provided. (Tr. 633) Barker continued treatment with Dr. Markowitz from March

2010 through May 2010. (Tr. 636-64) In April 2010, Dr. Markowitz noted diffuse thyroid

enlargement. (Tr. 645)

On May 4, 2010, Dr. Markowitz concluded that Barker was limited to lifting less than 10

pounds occasionally and less than 5 pounds frequently, standing and walking two hours total,

and sitting four hours daily due to back pain, restriction of motion, and severe pain. (Tr. 653-55)

On May 11, 2010, C. Ezike, M.D. answered interrogatories at the Commissioner's

request. He noted that he had not examined Barker and was an internist and occupational

medicine physician. (Tr. 580, 582) He determined that Barker would be able to lift up to 20

pounds occasionally and 10 pounds frequently, sit a total of six hours, and stand or walk two

6

hours each in a workday. He also stated that Barker was limited to occasional postural activities. (Tr. 575-78)

On August 26, 2010, Barker was evaluated by orthopedist David Harris, M.D. due to severe bilateral knee pain. Barker had a mild antalgic gait and crepitance of the knees. (Tr. 685-87) On September 24, 2010, Barker again was evaluated by Dr. Harris for bilateral medial compartmental knee pain after failing conservative therapy. Barker's knees were tender on examination, and x-rays showed moderate to advanced degenerative changes. Dr. Harris referred Barker to his partner for further evaluation of possible joint replacements. (Tr. 682-83)

On November 23, 2010, the ALJ issued her decision denying benefits.  At step one, the ALJ found that Barker had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 28) At step two, the ALJ found that Barker had the following severe impairments: degenerative joint disease, osteoarthosis of the bilateral knees, chronic back pain, and obesity. (Tr. 28)  At step three, the ALJ determined that Barker's impairments did not meet or equal a listed impairment.  (Tr. 30)

The ALJ next determined that Barker had the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) "except that the claimant can occasionally lift ten pounds and frequently lift five pounds.  The claimant can sit six hours out of an eight-hour workday and stand or walk with normal breaks for at least two hours in an eight-hour workday.  The claimant is not limited in his ability to push or pull.  The claimant can never climb stairs, ladders, ropes or scaffolds.  The claimant can occasionally stoop.  The claimant must be afforded the option to sit or stand alternatively at will provided the claimant is not off task more than ten percent of the work period."  (Tr. 31)

7

In reaching her RFC determination, the ALJ first discussed Barker's testimony.  Barker complained that he had pain in his legs, including his knees, ankles, hips, and muscles.  (Tr. 32) He further stated that he had pain in his lower back that impacted his ability to lift or sit for prolonged periods of time.  (Tr. 32) Barker had chest pains and high blood pressure, experienced numbness in his extremities, and had depression and sleeping problems.   (Tr. 32) The ALJ noted that she did not find Barker's testimony credible to the extent it conflicted with the RFC.  (Tr. 32)

The ALJ next addressed Barker's alleged degenerative joint disease and osteoarthritis of the knees.  (Tr. 32) The ALJ stated that the 2009 CT scan showed degenerative changes of the knees bilaterally that were moderate to severe in the medial compartments.  (Tr. 32) Barker had a mildly irregular gait and reported to his providers that his pain was a ten on a ten point pain scale.  (Tr. 32)

The ALJ then summarized the consultative examination Barker underwent in October 2008.  At the examination, Barker was unable to do range of motion tests for his back and tandem, heel, and toe walk.  (Tr. 32) Dr. Bautista found that Barker had a slight limping gait, normal strength in all extremities, good sensation in his upper and lower extremities, good left knee reflex, and a diminished or hyperactive right knee reflex.  (Tr. 32)

Dr. Emereuwaonu also performed a consultative examination.  (Tr. 32) Dr. Emereuwaonu found that Barker had a full range of motion in all parts of his body except his shoulders, full strength in his upper and lower extremities, sensation to a light touch and pinprick, no deformity, swelling, or stiffness, no effusion involving the hips, knees, and ankles, and normal knee and ankle reflexes.  (Tr. 33) Barker's spine was tender, he had an abnormal

gait, and he had difficulty completing tasks like walking on his heels and squatting. (Tr. 33) Dr. Emereuwaonu concluded that Barker had musculoskeletal pain that affected his functioning and that aggressive medical management could alleviate the symptoms. (Tr. 33)

The ALJ next discussed Barker's ability to ambulate, explaining that he testified that he was able to walk to the post office and back, a distance of about three blocks, and that he did so frequently. (Tr. 33) Barker could dress and groom himself, cook meals, go shopping, do laundry, and do yard work, including raking leaves and lifting piles of brush. (Tr. 33) Two months beore his alleged onset date, he was working twelve hours a day at a heavy exertional level as a construction worker. (Tr. 33) Despite reporting that his pain was a ten out of ten, he indicated that his medications were giving him thirty percent relief from pain. (Tr.33) When asked to clarify this, Barker reported that his pain was at an "unacceptable level". (Tr. 33) On other occasions, Barker reported that his pain was much lower, such as a three out of ten. (Tr. 33) The ALJ also noted that Barker responded well to conservative treatment such as chiropractic adjustments and physical therapy, and he reported that he was 90-95% better after receiving an epidural steroid injection. (Tr. 33)

The ALJ next engaged in a discussion of Barker's lower back pain. (Tr. 33) A CT scan revealed disc bulging and spondylotic changes and scattered minimal stenosis. (Tr. 33) The scan also revealed that the tiny central disc protrusion at L5-S1 did not cause significant stenosis. (Tr. 33) Barker testified that his back pain was a nine out of ten and that he could sit for only half an hour at a time as a result. (Tr. 34) The ALJ discredited this testimony because Barker was able to dress and groom himself, do laundry, drive, ride his mower, and fish. (Tr. 34) Barker admitted that he was well enough to sit in a chair until he got a bite and that he could reel in a

couple of twelve or thirteen inch fish.  (Tr. 34) Also, during his consultative examination, Barker had a full range of motion of his spine and previously reported relief from an epidural steroid injection.  (Tr. 34)

The ALJ next addressed the opinions of Barker's treating physicians.  (Tr. 34) She gave Dr. Joyce's opinion little weight because it was inconsistent with the record.  (Tr. 34) The ALJ found that Dr. Joyce's opinion that Barker only could stand and walk without interruption for less than half an hour and only could stand and walk for an hour over the course of the day was contradicted by Barker's testimony that he could walk to the post office frequently, go shopping, cook, do laundry, and perform yard work, including raking leaves and picking up brush.  (Tr. 34) The ALJ also found Barker's testimony that he enjoyed riding his mower, fishing, and watching television inconsistent with Dr. Joyce's opinion that Barker only was able to sit for less than a half hour at a time and for one hour in a day.  (Tr. 34) The ALJ further noted that Dr. Joyce's opinion was more restrictive than any other physician of record.  (Tr. 34)

The ALJ also gave little weight to Dr. Markowitz's opinion because it was inconsistent with the record.  (Tr. 34) Dr. Markowitz found that Barker could sit for an hour at a time and six hours in a day, which the ALJ stated was inconsistent with the activities Barker enjoyed, including riding his mower, fishing, and watching television, because these activities involved sitting for prolonged periods.  (Tr. 34) The ALJ also found that Dr. Markowitz's opinion that Barker would struggle to push and pull was inconsistent with Barker's ability to fish, rake leaves, and pick up brush.  (Tr. 34) The ALJ also noted that Barker had full strength in all of his extremities.  (Tr. 34)

The ALJ gave great weight to the opinion of the state agency physical consultant, Dr.

Whitley.  (Tr. 34) The ALJ found Dr. Whitley's opinion that Barker could sit for six hours in an eight hour work day was consistent with the activities Barker enjoyed, the x-ray of Barker's knee that only showed subtle marginal spurring, and the CT scan of Barker's spine.  (Tr. 35) The ALJ explained the minimal results of the CT and then chose to impose slightly greater restrictions than Dr. Whitley suggested.  (Tr. 35)

The ALJ also stated that she gave great weight to Dr. Ezike's opinion.  The ALJ explained that she found Dr. Ezike's opinion that Barker could sit for six hours in an eight hour work day consistent with the activities Barker enjoyed and his activities of daily living.  (Tr. 35) Dr. Ezike's opinion that Barker could walk or stand for two hours in an eight hour work day and thirty minutes at a time was consistent with Barker's ability to care for his personal needs, go shopping, cook meals, do laundry, and do yard work.  (Tr. 35) The ALJ also stated that Dr. Ezike's opinion was consistent with Barker's x-rays and CT scan because both revealed only mild problems.  (Tr. 35)

At step four, the ALJ determined that Barker had no past relevant work, and at step five she concluded that there were jobs that existed in significant numbers in the economy that Barker could perform.  (Tr. 36)

After the ALJ issued her decision denying benefits, Barker requested review by the Appeal's Council.  With his request for review, Barker submitted additional medical evidence, including notes prepared by Dr. Jonathan Javors, a CT scan, and operative notes from his knee replacement surgery.  Barker first saw Dr. Javors on October 18, 2010 for bilateral knee pain. He reported that cortisone shots, Hyaluronidase injections, and Voltaren pills did not help, although Voltaren gel provided some relief. He also reported his right knee was worse than his left. (Tr.

11

721) Upon examination, Barker had a marked antalgic gait with a shortened stance phase and a fairly substantial varus deformity. Fluid was present in both knee joints, the knees were tender with a positive patella compression test, pain was present in the medial compartment with some grinding and some pain around the patellofemoral compartments, and some spurring was present. Barker's x-rays from August 26, 2010 were reviewed, and they showed substantial medial compartment degenerative arthritis, posterior capsular rim signs, spurring off the lateral femoral condyle, and lateral tibial plateau on both sides, but slightly worse on the left. (Tr. 722) Cystic changes also were present in various areas.  Dr. Javors's impression primarily was medial compartment arthritis with genu varus, moderate to severe, and mild to moderate degenerative arthritis of the lateral compartment and the patellofemoral compartment of both knees. Dr. Javors explained that Barker had involvement of all three compartments of the knees, and as a result, likely needed total knee replacements. Although Dr. Javors preferred not to do such surgery on someone of Barker's age, he noted that he "would hate to do just the medial compartments and then come back for the total knee [replacement] in a few years." (Tr. 723)

On October 25, 2010, a knee CT scan showed severe degenerative joint disease of the left knee, moderate degenerative joint disease in the medial compartment of the right knee, and mild degenerative joint disease in the lateral and patellofemoral compartments bilaterally with bilateral small to medium-sized joint effusion. (Tr. 736) A bone scan showed high intensity uptakes in both knees, especially in the medial compartments, compatible with moderate to severe bilateral degenerative joint disease. (Tr. 738)

On November 15, 2010, Barker underwent a total right knee replacement due to severe degenerative arthritis. Operative notes indicated severe arthritis of the medial compartment,

12

moderate degenerative arthritis of the patella and trochlea, and minimal arthritis of the lateral compartment, with the presence of osteophytes. (Tr. 744)

Barker received physical therapy in November and December 2010. He was doing well, reporting pain at 6 on a 10 point scale, and he did not need pain medication. (Tr. 712-14, 762-764) On March 31, 2011, Dr. Markowitz issued a referral for a psychological/psychiatric evaluation to address Barker's depression, anxiety, and chronic pain issues, with counseling requested as an adjunct to chronic pain management. (Tr. 707) On April 1, 2011, Barker informed Dr. Javors that he was "going great" with his right knee replacement and wanted to schedule the left knee replacement. Barker reported no pain with the right knee, was able to walk, and was very happy with his progress. (Tr. 697)

On May 21, 2011, Barker received a left total knee replacement due to severe degenerative arthritis. Operative notes document "[s]evere arthritis of the medial compartment, bone on bone, and of the patellofemoral compartment" with osteophytes. (Tr. 701) Barker received physical therapy after the left knee replacement surgery. (Tr. 690-691)

On August 10, 2011, a lumbar spine CT scan showed multilevel degenerative disc disease, more severe at L2-L3 and L4-L5. The detailed notes documented moderate to severe degenerative disc disease at L2-L3 with vacuum phenomena and moderate bulging of the disc, which encroached centrally on the neural foramina bilaterally with probable encroachment on the bilateral L3 nerve roots. At L4-L5, there was bulging of the disc with a moderate sized disc protrusion resulting in probable compression of the right L5 nerve root, severe right neural foraminal and moderate left neural foraminal stenosis, and mild to moderate bilateral facet arthropathy. (Tr. 768-769)

13

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NRLB**, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012)*; Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not

14

less than 12 months.

**42 U.S.C. § 423(d)(1)(A)**.

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 404.1520.** The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 404.1520(b).** If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. § 404.1520(e).** However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).**

Barker first argues that the ALJ failed to assign the appropriate weight to his treating physicians' opinions and assigned greater weight than warranted to the opinions of the state

agency consultative physicians.  A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  **20 C.F.R. § 404.1527(d)(2)**; *See also Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) *(quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2)**;  *Clifford*, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony.  *Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see e.g. Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004).Ultimately, the weight assigned to a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining

16

benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." ***Hofslien v. Barnhart***, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

Barker first argues that the ALJ erred in giving great weight to the opinions of the non-examining state agency physician, Dr. Whitley, and Dr. Ezike because their opinions were rendered before significant evidence was admitted to the record.  Specifically. Dr. Whitely did not review any treating source statements, Dr. Emereuwaonu's examination notes, Dr. Markowitz's or Dr. Dasari's notes, the lumbar spine CT scan, the orthopedic evaluations, or the x-ray interpretations.  Similarly, Barker complains that Dr. Ezike did not see the spinal CT scan, Dr. Dasari's interpretation of the CT scan, or the records from the orthopedic surgeons concerning Barker's right knee.

At this stage, it is not the duty of the court to re-weigh the evidence and determine which physicians' opinions were most credible.  Rather, the court is charged with the duty of determining whether the ALJ provided a sufficient basis for her opinion.  In her opinion, the ALJ explained that she found Dr. Whitley's opinion consistent with the spinal CT scan because the CT scan revealed mild stenosis, scattered minimal stenosis, and tiny central disc protrusion.  The ALJ also explained how the opinion was consistent with the x-rays that Dr. Whitely did not review, stating that Barker's right knee showed very subtle marginal spurring, indicating early osteoarthritic changes.  The ALJ also explained that she found Dr. Ezike's opinion consistent with Barker's CT scan and x-rays for the same reasons.  Because these tests revealed only mild results, the ALJ determined that the medical evidence that Dr. Whitely and Dr. Ezike did not review was consistent with their opinions and explained as such.

17

Moreover, the ALJ pointed to Barker's own testimony to show that the opinions of Dr. Ezike and Dr. Whitley were entitled to great weight and that Barker was not disabled. The ALJ explained that Dr. Ezike and Dr. Whitely stated that Barker could sit for 6 hours in an 8 hour work day which was consistent with the activities Barker enjoyed, including fishing, mowing his lawn, and watching television. Dr. Ezike also opined that Barker could walk or stand for 2 hours in an 8 hour work day. The ALJ found this consistent with Barker's ability to care for his personal needs, shop, cook meals, do laundry, and do yard work, including raking the leaves and picking up the piles of brush.

Although Dr. Whitely and Dr. Ezike had not reviewed all of the medical evidence of record at the time they issued their opinions, the ALJ explained why the opinions were consistent with the later submitted medical evidence as well as Barker's own testimony. Additionally, Barker has not explained how further consideration of the later submitted evidence would alter either the physicians' or the ALJ's decision, and he has identified no conflicts between the physicians' opinions and the additional medical evidence. For these reasons, the court finds that the ALJ sufficiently supported her decision to afford the opinions of Dr. Whitely and Dr. Ezike greater weight.

Irrespective of the weight the ALJ assigned to the state consultative physicians, Barker disagrees with the weight the ALJ assigned to his treating physicians' opinions. Barker argues that the ALJ improperly rejected their opinions based on the minimal, sporadic activities that he reported and did not provide sufficient support for her rejection of their opinions. In her opinion, the ALJ stated that she gave Dr. Joyce's opinion little weight because it was inconsistent with the record as a whole. Dr. Joyce determined that Barker could stand and walk for less than half

an hour at a time and for one hour over the course of the day.  The ALJ found this inconsistent with Barker's report that he could walk to the post office frequently, go shopping, cook, do laundry, and perform yard work, including picking up brush and raking leaves.  Dr. Joyce also stated that Barker could sit for less than half an hour at a time and only could sit for one hour over the course of the day.  Yet Barker reported that he enjoyed riding his mower, going fishing, and watching television, all activities that involved sitting.  Dr. Markowitz similarly determined that Barker was restricted to sitting for an hour at a time and six hours in one day, but the ALJ explained that she found this consistent with the activities Barker enjoyed, including riding his lawn mower, fishing, and watching television, all activities that involved sitting for sustained periods of time.  Dr. Markowitz also concluded that Barker's ability to push and pull was greatly reduced, yet Barker stated that he could fish, rake leaves, and pick up piles of brush, all activities which were inconsistent with Dr. Markowitz's opinion.

The notes to SSR 96-8P explain that the "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  When making this determination, the ALJ may consider the claimant's daily activities. If the ALJ places significant weight on a claimant's daily activities to support a finding that the claimant can sustain employment, the activities must reflect that the person is capable of engaging in work eight hours a day for five consecutive days a week.  *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).  *See also Hughes v. Astrue, No.* 12-1873, 705 F.3d 276, 278-279 (7th Cir. Jan. 16, 2013); *Roddy v. Astrue*, No. 12-1682 (7th Cir. Jan. 18, 2013).  To show this, the record should reflect that the claimant engages in such activities for a substantial part of the

day. *Carradine*, 360 F.3d at 756. Evidence of sporadic physical activity is not sufficient because a claimant may engage in sporadic activities despite pain, but he may not be able to engage in continuous activity for an 8-hour workday. *Carradine*, 360 F.3d at 756. Moreover, the activities must be translatable to a work setting. *Carradine,* 360 F.3d at 756. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Hughes*, No. 12-1873. The ALJ must make a clear record that the claimant's activities are such that the claimant could perform duties common to the work place on a sustained basis. *Carradine,* 360 F.3d at 756.

In *Carradine*, the claimant testified that she could drive, shop, and do housework. *Carradine,* 360 F.3d at 756. The ALJ relied on this when determining that the claimant was capable of working. *Carradine,* 360 F.3d at 756. On appeal, the Seventh Circuit explained that although the claimant could perform these activities, the claimant performed the reported activities on a sporadic basis and the record was not clear whether these skills were capable of translation to a work setting or whether the claimant could sustain activity on a continuous basis during an 8-hour work day. *Carradine,* 360 F.3d at 756. The Seventh Circuit remanded for further explanation of how the claimant's reported daily activities were consistent with a finding that she could engage in work eight hours a day, five days a week. *Carradine*, 360 F.3d at 756.

When assessing the weight to assign to a claimant's daily activities, the courts generally have considered whether the activities were performed at the claimant's own pace, whether they were performed at the claimant's home, whether the activities were structured around the

claimant's physical limitations, whether they were essential for survival and may have been performed in spite of pain, and whether the claimant engaged in the activities in a continuous manner.

Here, the ALJ identified not only activities that were necessary for Barker's survival but also activities that he enjoyed, such as fishing, watching television, and riding his lawn mower. The ALJ also took the additional step of showing how the activities Barker performed translated into a work setting.  For example, the ALJ explained that the activities Barker enjoyed displayed that he could sit for a period of time and that his ability to do yard work and rake leaves suggested that he could reach.  Because the ALJ drew a connection between Barker's reported activities and her RFC finding, the court finds that the ALJ satisfied her duty and sufficiently explained her reliance on Barker's reported daily activities.

In addition to relying on Barker's daily activities, the ALJ also pointed to Barker's medical records to bolster her opinion.  Specifically, the ALJ explained that Dr. Joyce's opinion was inconsistent with Barker's other treating physicians, as the others concluded that Barker had a greater RFC.  The ALJ also found that Dr. Markowitz's opinion that Barker would struggle to push and pull, was inconsistent with his examination notes which revealed that Barker had full strength in his upper and lower extremities.  In light of the ALJ's explanation rejecting the physicians' opinions based on Barker's reported daily activities and the contradictory medical records the ALJ identified, the court finds that the ALJ sufficiently supported her reason for assigning less weight to the opinions of Barker's treating physicians.

Barker next complains that the ALJ's negative credibility finding was not supported by substantial evidence.  This court will sustain the ALJ's credibility determination unless it is

21

"patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir.

2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact

grounds his credibility finding in an observation or argument that is unreasonable or unsupported

... can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her

opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v.*

*Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit

findings and does not explain them "in a way that affords meaningful review," the ALJ's

credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th

Cir. 2002). Further, "when such determinations rest on objective factors or fundamental

implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate

courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000).

  The ALJ must determine a claimant's credibility only after considering all of the

claimant's "symptoms, including pain, and the extent to which [the claimaint's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence."

**20 C.F.R. §404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007)("subjective

complaints need not be accepted insofar as they clash with other, objective medical evidence in

the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's

impairments reasonably could produce the symptoms of which the claimant is complaining, the

ALJ must evaluate the intensity and persistence of the claimant's symptoms through

consideration of the claimant's "medical history, the medical signs and laboratory findings, and

statements from [the claimant, the claimant's] treating or examining physician or psychologist,

or other persons about how [the claimant's] symptoms affect [the claimant]."  **20 C.F.R. §404.1529**( c); *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). She must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Barker criticizes the ALJ's credibility determination because the ALJ cited sporadic activities as the basis of discrediting his testimony. Specifically, Barker argues that his activities, including fishing and using his riding lawn mover, primarily involved sitting in one spot and did not support a finding that he could perform work on a sustained basis for an eight hour work day. It is true that the ALJ cannot rely on sporadic activities that did not suggest that the claimant can perform work on a sustained basis for an eight hour work day. However, it does not appear that this is what the ALJ did here. Barker's abilities to sit and fish and to ride his lawnmower were consistent with the sedentary job restriction the ALJ imposed as well as her finding that Barker could sit for 6 hours of an 8 hour work day. The ALJ also determined that

Barker could push, pull, and reach, as was evident by his ability to fish, rake leaves, and pick up piles of brush.  The ALJ also noted that Barker could walk, albeit short distances, which was consistent with her restriction to sedentary jobs and to allow Barker to sit and stand at will.  The ALJ tied Barker's daily activities into her RFC finding and has demonstrated that Barker's complaints of disabling pain were not supported by his daily activities and were consistent with the ability to work.

In support of her credibility determination, the ALJ also pointed to medical records that were inconsistent with Barker' testimony concerning the extent of his pain.  For example, Barker reported that his medication gave him thirty percent relief from his pain, he reported to his physicians that his pain was significantly less than he reported at the hearing, and he responded positively to conservative treatments such as chiropractic adjustments and physical therapy. Together, the ALJ satisfied her burden and provided a thorough explanation of the basis of her credibility determination.

Finally, Barker argues that remand is necessary because he submitted new and material evidence to the appeals council that should be considered by the ALJ.  A claimant is permitted to submit new and material evidence to the Appeals Council. **20 C.F.R. §§ 404.970(b), 416.1470(b).** However, the district court can consider the new evidence that was before the Appeals Council only if the Council has accepted the case for review and has made a decision on the merits, based on all the evidence before it. ***Eads v. Secretary of Dept. of Health and Human Services***, 983 F.2d 815, 817 (7th Cir.1993). To hold otherwise would change the role of a reviewing court to that of an ALJ, requiring the court to sort through and weigh the new evidence. ***Eads***, 983 F.2d 817.

Otherwise, a claimant can request that the district court remand the case to the Social Security Administration upon a showing that the evidence was new and material and that there was good cause for the failure to incorporate the evidence earlier. **42 U.S.C. § 405(g).** " 'New' evidence is evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Jens,* 347 F.3d at 214 ( citing ***Sample v. Shalala***, 999 F.2d 1138, 1144 (7th Cir. 1993)) ( quoting ***Sullivan v. Finkelstein***, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). Evidence is material if there is a " 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Jens*, 347 F.3d at 214 ( quoting ***Perkins v. Chater***, 107 F.3d 1290, 1296 (7th Cir. 1997)).

The parties dispute whether the new evidence Barker submitted was material.  To recall, Barker submitted Dr. Javor's interpretation of an August 2010 knee x-ray, an October 2010 knee CT and bone scan, Dr. Javor's opinion that Barker required bilateral knee replacement at a young age, and the operative reports from those surgeries.  Dr. Javor also observed that Barker' left knee had severe arthritis and was bone on bone.

It is not evident how this additional evidence was material.  Although these new observations and surgery support Barker's complaints of pain, the ALJ already had accommodated Barker' knee pain by restricting him to a sedentary position.  Barker argues that this new evidence would have resulted in even further limitations, but it is not clear what further limitations could have been imposed, as the ALJ's RFC determination already eliminated all use of the knees by restricting Barker to a sedentary position.  Barker has done no more than allege the evidence was material without making any attempt to show how it would have affected the RFC or was inconsistent with the ALJ's RFC finding.  For this reason, the new evidence would

not be material to the ALJ's RFC determination.

Barker also pointed to the August 10, 2011 lumbar spine CT scan, which showed disc herniation and two areas of nerve impingement.  Barker states that this evidence was not available until after the ALJ rendered her decision and argues only that this evidence supports the treating physicians' opinions and is material, without further explanation.  However, evidence only is material if it is relevant to the time period encompassed by the disability application under review.  *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989).  The Appeals Council and the court only will consider new evidence that was prepared after the time the ALJ issued her decision if the evidence relates to the period on or before the date the ALJ issued her decision.  **20 C.F.R. §§ 404.970, 416.1470**; *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005); *Chapman v. Barnhart,* 189 F.Supp.2d 795, 805-806 (N.D. Ill. 2002); *Morgan v. Astrue*, 623 F.Supp.2d 971, 977 (S.D. Ind. 2009).   And here, the ALJ issued her decision on November 23, 2010, approximately nine months before the lumbar CT scan was performed.  Barker has made no attempt to show that the CT scan reveals anything about his condition during the relevant time period, that which  preceded the ALJ's decision.  For this reason, the CT scan is not material and does not warrant remand.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED.**

ENTERED this 19th day of August, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge

27